Marion J. BROWN and Allen Brown, Plaintiffs-Appellants,

v.

UNITED STATES FIDELITY AND GUARANTY COMPANY, Defendant-Appellee.

No. 174, Docket 27407.

United States Court of Appeals Second Circuit.

Argued Jan. 28, 1963.

Decided Feb. 28, 1963.

Charles Haydon, of Dublirer & Haydon, New York City, for plaintiffs-appellants.

John J. O'Connor, New York City (James M. Gilleran, New York City, of counsel), for defendant-appellee.

Before LUMBARD, Chief Judge, and KAUFMAN and HAYS, Circuit Judges.

KAUFMAN, Circuit Judge.

Plaintiffs in the court below appeal from an order dismissing their complaint at the close of the entire case.

One of the plaintiffs, Mrs. Marion J. Brown, is holder of an automobile liability policy issued by the defendant, United States Fidelity and Guaranty Company. The co-plaintiff, her son, was driving the insured's car when it collided with a taxicab, causing serious injuries to four individuals—the driver of the taxicab, two of his passengers, and a companion of young Brown who was seated next to him in Mrs. Brown's automobile.

The coverage of the insurance policy was $10,000 for each person injured and $20,000 total for each accident. The policy contained the usual terms providing that the company has the duty to defend personal injury actions against the assured and that the investigation, negotiation and settlement of any claim or suit is to be under the exclusive control of the company. The defendant settled the claim of David Borowiak, Brown's car companion, for $6,000, and the claim of Morris Ruby, the driver of the taxicab, for $8,000. With only $6,000 remaining unexpended under the insurance policy, the two passengers in the taxicab, Miss Joan O'Dwyer and Anthony E. Sacco, commenced an action in the New York state courts against the plaintiffs herein and secured judgments of $25,000 and $20,000 respectively. The instant action was commenced against the insurance company seeking recovery in the amount of $39,000, the difference between the plaintiffs' personal liability resulting from the O'Dwyer-Sacco suit and the remaining coverage under the policy. It is alleged as a basis for the claim that the company conducted settlement negotiations in bad faith, abandoning the interests of the assured, and that such bad faith resulted in liability in excess of the limits provided in the policy.

I.

In order that the facts leading up to this action may be viewed in the proper perspective, it is necessary to summarize the legal principles which govern suits resting upon the purported misconduct of an insurance company in the settlement

and defense of claims against its policy holders.

Correlative to the company's duty to defend and its control over settlement negotiations, pursuant to its policy of insurance, is an obligation to the assured. The scope of that obligation has rarely been defined with precision. Some states have adopted an objective standard, under which the insurance company must accept a settlement offer or conduct the assured's defense in a manner befitting an "ordinarily prudent insurer" with experience in such matters. Other states have adopted a more lenient standard of obligation to the assured, a subjective standard, under which the company may not be held liable for an honest mistake in judgment, even if unreasonable; it is liable only for an intentional disregard of the assured's financial interests. Much ink has been spilled in an effort to define and to distinguish the rule of negligence from the rule of bad faith. For some of the more helpful discussions, see 7A Appleman, Insurance Law and Practice §§ 4711–13 (1962); Keeton, "Liability Insurance and Responsibility for Settlement." 67 Harv.L.Rev. 1136 (1954); Note, 43 Iowa L.Rev. 588 (1958); Note, 62 Harv.L.Rev. 104 (1948); Note, 34 Colum.L.Rev. 511 (1934); Annot., 40 A.L.R.2d 168 (1955). Perhaps the one conclusion upon which almost all authorities agree is that the distinction between negligence and bad faith in these insurance-settlement cases is more difficult to trace than most legal distinctions.[1]

But there is sufficient difference between the two standards of obligation so that the more recent and better reasoned cases have opted rather clearly for the "settlement in good faith" standard. See, e. g., Bell v. Commercial Ins. Co., 280 F.2d 514 (3d Cir., 1960); Tennessee Farmers Mut. Ins. Co. v. Wood, 277 F.2d 21 (6th Cir., 1960); Comunale v. Traders & Gen. Ins. Co., 50 Cal.2d 654, 328 P.2d 198, 68 A.L.R.2d 883 (1958); Brown v. Guarantee Ins. Co., 155 Cal. App.2d 679, 319 P.2d 69, 66 A.L.R.2d 1202 (Dist.Ct.App.1957); Henke v. Iowa Home Mut. Cas. Co., 250 Iowa 1123, 97 N.W.2d 168 (1959); Radcliffe v. Franklin Nat'l Ins. Co., 208 Or. 1, 298 P.2d 1002 (1956). The New York law, which governs here, is indefinite in many respects. Many of the early cases contained language strongly indicating that the company's power over settlement amounted to a discretion well-nigh unlimited, and that the assured was without remedy for even reckless refusals (short of positive fraud) to settle leading ultimately to personal liability well beyond the limits of the insurance policy.[2] From other New York cases, one could draw the conclusion that the good-faith settlement standard prevailed,[3] and

---

1. See Appleman, supra at 562 (the two terms "are to some extent interchangeable"); Keeton, 67 Harv.L.Rev. at 1140 ("The distinction between the 'bad faith rule' and the 'negligence rule' is less marked than these terms would suggest."); Annot., 40 A.L.R.2d at 171 ("the two tests of 'good faith' and 'negligence' have tended to coalesce * * * much the same factors have been relied upon in those cases finding a breach of good faith as in those finding negligence."). See generally Radcliffe v. Franklin Nat'l Ins. Co., 208 Or. 1, 298 P.2d 1002, 1018 (1956).

2. See Auerbach v. Maryland Cas. Co., 236 N.Y. 247, 140 N.E. 577, 28 A.L.R. 1294 (1923); Silverstein v. Standard Accident Ins. Co., 175 App.Div. 639, 162 N.Y.S.

601 (1916); Levin v. New England Cas. Co., 97 Misc. 7, 160 N.Y.S. 1041 (Sup. Ct.1916), and 101 Misc. 402, 166 N.Y.S. 1055 (Sup.Ct.1917), aff'd mem., 233 N.Y. 631, 135 N.E. 948 (1922); cf. Countryman v. Breen, 241 App.Div. 392, 271 N.Y.S. 744 (1934), aff'd mem., 268 N.Y. 643, 198 N.E. 536 (1935); McAleenan v. Massachusetts Bonding & Ins. Co., 173 App.Div. 100, 159 N.Y.S. 401, aff'd mem., 219 N.Y. 563, 114 N.E. 114 (1916).

3. See Streat Coal Co. v. Frankfort General Ins. Co., 237 N.Y. 60, 142 N.E. 352 (1923); Brassil v. Maryland Cas. Co., 210 N.Y. 235, 104 N.E. 622, L.R.A.1915A, 629 (1914); Brunswick Realty Co. v. Frankfort Ins. Co., 99 Misc. 639, 166 N.Y.S. 36 (Sup.Ct.1917); cf. New York Consolidated Ry. Co. v. Massachusetts

the New York Court of Appeals spoke out clearly on behalf of that standard in 1928, in Best Bldg. Co. v. Employers' Liability Assur. Corp., 247 N.Y. 451, 160 N.E. 911, 71 A.L.R. 1464, expressly distinguishing it from the negligence standard.[4]

Despite the absence of a clear, recent pronouncement on the subject, we are convinced that the good-faith settlement standard controls in New York in cases of an assured's personal liability resulting from the insurer's failure to settle within policy limits. The opinion of the highest state tribunal in the Best Bldg. Co. case comports with the modern trend of the law, and has been cited with approval in several subsequent decisions which have adopted the good-faith standard.[5] The source and nature of the standard has been succinctly stated in a recent case:

> "Since the company * * * has the power, through the control of settlement, to adversely affect the insured's interests, it must necessarily bear a legal responsibility for the proper exercise of that power. Thus, the law imposes upon the insurer the obligation of good faith— basically, the duty to consider, in good faith, the insured's interests as well as its own when making decisions as to settlement."

Harris v. Standard Acc. & Ins. Co., 191 F.Supp. 538, 540 (S.D.N.Y.), rev'd on other grounds, 297 F.2d 627 (2d Cir., 1961), cert. denied, 369 U.S. 843, 82 S.Ct. 875, 7 L.Ed.2d 847 (1962). See Hilker v. Western Auto. Ins. Co., 204 Wis. 1, 235 N.W. 413 (1931).

How much consideration should be given to the assured when the company is confronted with a conflict between its interests and those of the assured has been the subject of some contention. The sharpest conflict is between cases which hold that the insurance company must sacrifice its interest to that of the assured, and those which hold merely that the company need only give equal consideration to its financial interest and that of the assured. See Keeton, 67 Harv.L.Rev. at 1144–45. It is unrealistic to assume, however, that the New York courts today would adhere to the position apparently espoused in the early cases, that the company is not bound to consult the interests of the insured at all in the event of a conflict. It is most likely that those courts, in implementing the good-faith settlement standard, would conclude that the interests of the assured must be given at least equal consideration in evaluating the propriety of a settlement. Professor Keeton has paraphrased the rule as follows: "With respect to the decision whether to settle or try the case, the insurance company must in good faith view the situation as it would if there were no policy limit applicable to the claim." 67 Harv.L.Rev. at 1148. "[T]he fairest method of balancing the interests is for the insurer to treat the claim as if it were alone liable for the entire amount." Bell v. Commercial Ins. Co., 280 F.2d 514, 515 (3d Cir., 1960).[6]

Thus, for purposes of illustration, we might assume that an insurance company issues a liability policy with a limit of $20,000, that an action is brought against the assured for $45,000, and that the claimant has offered to compromise its claim for $15,000. We might further assume that the assured's responsibility for the collision is hardly in doubt, and that the claimant's injuries are very serious. Had the policy limit been $50,000, that is, had the damages claimed in the action as well as the compromise offer

Bonding & Ins. Co., 193 App.Div. 438, 184 N.Y.S. 243 (1920), aff'd mem., 233 N.Y. 547, 135 N.E. 912 (1922).

4. See also Schencke Piano Co. v. Philadelphia Cas. Co., 216 N.Y. 662, 110 N.E. 1049 (1915).

5. See Noshey v. American Auto. Ins. Co., 68 F.2d 808, 810 (6th Cir., 1934); Brown v. Guarantee Ins. Co., supra, 319 P.2d at 74; Radcliffe v. Franklin Nat'l Ins. Co., supra, 298 P.2d at 1013.

6. See Radcliffe v. Franklin Nat'l Bank, supra, 298 P.2d at 1020–1023.

both fallen within the policy limits, making the company fully responsible, then it might be reasonable to find that the company acted recklessly if it failed to accept the compromise offer. The degree of recklessness might be even greater if, for example, the company failed to investigate the precise nature of the collision and the relative degree of fault of the parties involved. Recklessness in such circumstances is tantamount to bad faith when we assume that the policy limit is only $20,000 and that the assured is personally responsible for any excess liability. In such a case, the risk to the company in going to trial is $5,000; the risk to the assured is $25,000. For the company to take the risk under the facts as posited may well be viewed as "the intentional disregard of the financial interests" of the assured, Radcliffe v. Franklin Nat'l Ins. Co., supra, 298 P.2d at 1022, or the "willingness to gamble with the insured's money," Tennessee Farmers Mut. Ins. Co. v. Wood, 277 F.2d 21, 34 (6th Cir., 1960), which constitutes bad faith and subjects the company to liability beyond the policy limits.

█ Since the good-faith settlement standard presupposes investigation of a subjective fact, a state of mind, good or bad faith is generally proven by circumstantial evidence.

"It is most readily inferable when the severity of the plaintiff's injuries is such that any verdict against the insured is likely to be greatly in excess of the policy limits, and further when the facts in the case indicate that a defendant's verdict on the issue of liability is doubtful. * * * When these two factors coincide, and the company still refuses to settle, the inference of bad faith is strong."

Harris v. Standard Acc. & Ins. Co., 191 F.Supp. at 540. Other facts which have recurrently contributed to findings of bad faith on the part of the insurance company are its failure properly to investigate the circumstances of the accident so as to ascertain the evidence against the assured, attempts by the company to induce the assured to contribute to a settlement within the policy limits, failure of the insurer to inform the assured of a compromise offer,[7] and a considerably greater burden of the financial risk involved in litigation falling upon the assured than upon the company.[8] It is readily observable that many of the factors relevant here are also relevant to a negligence standard for the insurer's liability. Thus, negligent investigation may prevent a company from making an honest and informed evaluation of the risks of refusing settlement.[9] Although

7. The New York Court of Appeals, in Streat Coal Co. v. Frankfort Gen. Ins. Co., 237 N.Y. 60, 142 N.E. 352 (1923), affirmed the dismissal of a complaint which alleged refusal by the insurance company to disclose a settlement offer. The gist of the opinion seems to be that failure or refusal to disclose does not constitute bad faith as a matter of law and that the complaint was subject to attack for not alleging bad faith as a matter of fact. The case is therefore not at all inconsistent with the prevailing view that "[f]ailure on the part of the insurer and counsel to inform the insured of his possible excess liability or to disclose to him the status of settlement negotiations and offers of settlement may be indicative of bad faith." Henke v. Iowa Home Mut. Cas. Co., 97 N.W.2d at 174. See Harris v. Standard Acc. & Ins. Co., 191 F.Supp. at 543; Radcliffe v.

Franklin Nat'l Ins. Co., supra, 298 P.2d at 1024; 7A Appleman, supra at 554; Roos, "A Note on the Excess Problem," 1952 Ins.L.J. 192, 195; Note, 43 Iowa [Law Review] 588, 600 (1958).

8. See generally Brown v. Guarantee Ins. Co., supra, 319 P.2d at 75; 7A Appleman, supra § 4712, at 572; Annot., 40 A.L.R.2d 168 (1955).

9. See Tennessee Farmers Mut. Ins. Co. v. Wood, 277 F.2d 21, 41 (6th Cir. 1960) (dissenting opinion); Ballard v. Citizens Cas. Co., 196 F.2d 96 (7th Cir. 1952); Hencke v. Iowa Home Mut. Cas. Co., 97 N.W.2d at 174; Radcliffe v. Franklin Nat'l Ins. Co., supra; Hilker v. Western Auto Ins. Co., 235 N.W. at 415; 7A Appleman, supra at 569, 571; cf. Auerbach v. Maryland Cas. Co., 236 N.Y. 247, 252, 140 N.E. 577, 28 A.L.R. 1294 (1923); Brassil v. Maryland Cas.

negligence alone is insufficient to render the insurer liable, serious and recurrent negligence may be indicative of bad faith. The various factual permutations in these excess-liability cases generally require that the issue of liability be submitted to the trier of fact.[10]

■ Here, we hold that there was sufficient evidence of the defendant's bad faith in conducting settlement negotiations to warrant submitting the case to the jury. Our conclusion is based upon the evidence we shall discuss in part II and the drawing of those inferences favorable to the appellants, for such is the appropriate standard of review when the complaint has been dismissed by the court at the close of a jury case, or the verdict adversely directed. See O'Connor v. Pennsylvania R. Co., 308 F.2d 911 (2d Cir., 1962); 2B Barron & Holtzoff, Federal Practice and Procedure § 1075 (1961).

## II.

Co-plaintiff Allen Brown was driving his mother's automobile south on the East River Drive in Manhattan on the night of February 14, 1957. In his company was David Borowiak, a soldier friend with whom he apparently had been drinking earlier in the evening. The Brown automobile made contact with the divider in the center of the highway, causing Brown to lose control and the automobile to come to rest transversely upon the divider. A taxicab traveling in the opposite direction, driven by Morris Ruby and occupied by Anthony Sacco and Joan O'Dwyer, collided with the Brown automobile, "jumped" the divider, and turned over onto the other side of the highway. Although young Brown received only minor injuries, the other four people involved—Ruby, O'Dwyer, Sacco, and Borowiak—suffered serious injuries. When the insurance company received notice of the accident twelve days later, it was immediately obvious that, due to the multiplicity of potential claimants,

the seriousness of their injuries, and the relatively low policy limits, the policy would be insufficient to meet the claims; in insurance vernacular, "the policy was gone".

During the month of April 1957, the company's superintendent of liability claims, Mr. Fitzgibbons, contacted Paul O'Dwyer, the attorney representing the two taxicab passengers, and informed him that the Brown policy was limited to $20,000. O'Dwyer testified in behalf of the Browns that Fitzgibbons agreed not to deal with any of the claims until all of them were before the company and could be investigated, and that he "would deal with all together. He would not deal with one without the other." It was apparently agreed that if all four claimants would consent, the $20,000 policy limit would be apportioned among them in some equitable manner. Believing that the Browns were not persons of means and that there was little likelihood of recovering anything beyond the policy limits, Mr. O'Dwyer agreed that he would share the policy proceeds equitably between his two clients and Ruby and Borowiak if Fitzgibbons made an effort to contact the latter two claimants and obtained their consent to the settlement. This possibility of settling within the policy limits was enhanced when, as Mr. O'Dwyer testified, he spoke with the taxicab driver's attorney, Mr. Ratner, who "agreed to go along" with the settlement proposal.

Although the defendant had a standing practice of investigating the possibility of contributory negligence on the part of claimants involved in automobile accidents, it failed to look into the possibility of Borowiak's contributory negligence stemming from his activities with young Brown on the evening of the accident. Nor did the company investigate the scene of the collision to determine the surface of the road, its curvature, the lighting, the existence and significance

Co., 210 N.Y. 235, 240, 104 N.E. 622, L.R.A.1915A, 629 (1914).

10. See 7A Appleman, supra at 571, and cases there cited.

of skidmarks. It is true that such an investigation might well have been rendered largely fruitless by the passage of time between the accident and the date the company was notified; but it could have secured an existing report of an investigation by the Police Accident Investigation Squad or obtained the minutes of a hearing before the New York State Motor Vehicle Bureau conducted shortly after the accident. The company did neither.

While O'Dwyer's settlement proposal of April 1957 was still pending, the company conducted separate settlement negotiations with Borowiak, who had since returned to his army base in Milwaukee; a settlement of his claim, for $6,000, was arranged on June 21, 1957. It was negotiated through an insurance adjuster in Milwaukee, apparently without regard to the alleged agreement with Mr. O'Dwyer and the consequences of withdrawing from the $20,000 insurance fund, which would have been available to all four claimants, the sizeable sum of $6,000. There was evidence at the trial that no medical reports regarding the relative seriousness of the injuries to all the claimants passed between the Milwaukee office and the New York office, which was handling the Ruby, Sacco, and O'Dwyer claims.

Although Borowiak reached an entente with the company in June 1957, Mr. O'Dwyer was not informed of that fact until September 11, at which time he personally told Fitzgibbons and one Smith, the liability claims examiner, that the settlement was "not in accordance with our agreement." Smith testified that he "had an inkling" that a claim of bad faith emanating from O'Dwyer "was in the works." In fact, there was also evidence of correspondence between the company's representatives in Milwaukee and New York, with reference to the bad faith overtones of the Borowiak settlement. On the very day of his meeting with Fitzgibbons and Smith, O'Dwyer wrote to the company, complaining of the breach of the April agreement and de-

manding that he be dealt with fairly. Stating that the Borowiak settlement was egregious because it was "with the one least likely to recover," O'Dwyer reiterated his desire to adhere to the terms of the settlement proposal: "[W]e are quite willing to accept the proposals which had heretofore been suggested —that you place your policies at the disposal of all claimants and that no further recovery be sought against your insured." Apparently at no time during these entire proceedings were the plaintiffs here apprised of O'Dwyer's April settlement proposal or of its revitalization in his letter of September 11.

Despite O'Dwyer's renewed disclaimer of any interest in reaching the personal assets of the assured, the company, some five days later, wrote to the Browns' personal attorney and stated that Mr. O'Dwyer was "interested in obtaining some contribution from our assured personally, above and beyond the policy limits."

To conclude this rather complex saga, we note that the company, on December 18, 1957, proceeded to settle the claim of Ruby, the taxicab driver, for $8,000. There then remained within the policy coverage of $20,000 only $6,000, making it unlikely if not impossible that the claims of Miss O'Dwyer and Mr. Sacco could be settled. For it is asserted that they were the most seriously injured of the claimants and the only ones who could not conceivably be charged with contributory negligence. As we have observed, their action against the Browns ultimately was tried, and terminated in judgments totaling $45,000.

### III.

This case differs from the usual case involving allegations of the insurer's bad faith. Ordinarily, the insurer is taken to task for obstinately refusing to reach a settlement at all, despite the availability of a reasonable offer from an injured party. Here, however, the insurer has participated, successfully, in settlement negotiations with two of the four claim-

ants; it is the company's *over-eager* settlement of the claims in disregard of the possibility of the assured's resulting personal liability which, *inter alia*, is asserted as evidence of bad faith. We are well aware of the difficulties involved in appraising an insurer's conduct in reaching a purportedly unfair settlement rather than reaching no settlement at all. But the difference is not dispositive. In either case, the issue to be adjudicated will be whether the insurer's conduct reveals a bad-faith disregard of the assured's financial interest.

We need not decide whether any *one* of the elements of misconduct charged here—e.g., failure to abide by the agreement to try to effect settlement of the four claims within $20,000, failure to conduct an adequate investigation, the settlement with Borowiak without informing the other claimants and without adequate information of the relative seriousness of the claims, the apparent unconcern for O'Dwyer's renewal of the proposal, the assertion of what appears to be a gross misrepresentation as to O'Dwyer's intention to reach the personal assets of the assured, the failure to inform the assured of any of the settlement proposals or possibilities [11]—would be sufficient to warrant submitting the case to the jury. But it does seem clear to us that the case as presented by the plaintiffs—viewing the testimony, documents, and inferences in a light most favorable to them—was *prima facie* sufficient on the issue of bad faith to take the case to the jury. What we have said is not, of course, to be construed as a judgment on the merits of the litigation. We say only that the jury should have been given the opportunity to pass upon the issue of bad faith.

Reversed and remanded.

11. In an article directed especially to the liability insurance company, O'Brien, "Liability Beyond the Policy Limit," 1955 Ins.L.J. 525, 529, it is advised that "to avoid being charged with bad faith \* \* \* keep the insured fully informed of the progress of the case and developments, and particularly of the settlement

negotiation and demands. If there is a reasonable offer to settle above the policy limits, he should be so notified and given the opportunity to put in the amount necessary above the limits to effect settlement if he so desires or his own attorney so advises him."