Harold A. BATES, Plaintiff,

v.

MERCHANTS MUTUAL INSURANCE COMPANY, Defendant.

No. 65–CV–70.

United States District Court
N. D. New York.

Dec. 16, 1967.

PORT, District Judge.

### Memorandum-Decision and Order

This is a diversity action brought by Harold Bates (the insured), a citizen of Florida, against Merchants Mutual Insurance Company (the carrier), a New York Corporation, to recover the amount by which judgments against the insured, obtained in 1964 in negligence actions in which he admitted liability, exceeded his coverage under an automobile liability policy issued to him by the carrier.

On June 11, 1962, while operating the insured automobile, the insured became involved in an accident with a car operated by Sadie Ryder in which her husband Joseph Ryder, Jr., was a passenger. Sadie Ryder was pronounced dead at the scene of the accident; her husband sustained serious personal injuries, as a result of which he died approximately seventeen months later.

At the time of the accident the insured was covered by a liability policy issued by the carrier with liability limited to $20,000.00 for each person and $40,000.00 for each occurrence. The carrier agreed to defend any claim made against the insured and reserved to itself the right of "settlement of any claim or suit as it deems expedient."

The dispute arises out of carrier's refusal to settle as a "package deal," within policy limits, two claims arising out of a single accident,[1] where the verdict on one claim was unquestionably expected to exceed the limits applicable to that claim and result in substantial personal liability being imposed upon the insured. No case dealing with this factual situation has been cited by counsel or found by the court.

Shortly after the accident, Daniel Citak was retained to institute suits on the claims for personal injuries to Mr. Ryder and for conscious pain and suffering and wrongful death of Mrs. Ryder. Laurence Wagner was retained by the carrier to represent Mr. Bates on the trial.

Although suits were instituted, there is no evidence of attempts on the part of

Bonney & Nicit, Waterloo, N. Y., John Nicit, Waterloo, N. Y., of counsel, for plaintiff.

Bond, Schoeneck & King, Syracuse, N. Y., John C. Kinney, Syracuse, N. Y., of counsel, for defendant.

---

1. "Each Occurrence" under the terms of the policy.

either the carrier or the Ryders' attorneys to negotiate a settlement of the claims until after Mr. Ryder's death on November 23, 1963.

Thereafter, the cause of action asserted on behalf of his estate was amended to include a claim for wrongful death, as well as conscious pain and suffering.

The first effort to negotiate a settlement occurred at a pretrial conference held before Supreme Court Justice Jasen in Erie County where the suits were pending. At that conference Mr. Citak demanded $37,500.00 as a package settlement of both suits for conscious pain and suffering and wrongful death. The carrier responded to these demands by offering $25,000.00. The case at that juncture was put over the term and negotiations were not renewed until the case got on a trial calendar and was ready for trial before Justice King in Supreme Court, Erie County. Settlement conferences were conducted before and during the trial.

After the jury was drawn but before proof was started, a conference was held in Justice King's chambers regarding a possible settlement. In that conference Mr. Citak demanded a total of $39,000.00 in settlement of both cases. This was subsequently reduced to what was termed as his "absolute rock-bottom figure" of $37,500.00. At this point the carrier was offering $25,000.00 as a total settlement. The attorney negotiating on behalf of the carrier called the carrier for further authorization. He returned to the conference to state that he had additional authority of two or three thousand dollars, but in view of plaintiff's rock-bottom demand not much purpose would be served in making a further offer because he was not authorized to meet the $37,500.00 demand.

The insured admitted liability on the trial and the claims were submitted to the jury solely on the issue of damages. At the time of admitting liability, Mr. Wagner made a formal offer of settlement in the Joseph Ryder case in the amount of $20,000.00, the full amount of the coverage for each person.

On the second day of the trial negotiations were renewed in Justice King's chambers. Justice King recommended a settlement of $33,000.00 in both cases. Following this conference the carrier made a firm offer of $30,000.00 to settle both suits.

This same offer was renewed in Justice King's chambers at a further conference after the close of the evidence and before the summations. At the close of the plaintiff's evidence Justice King had dismissed the cause of action for conscious pain and suffering asserted in the complaint with reference to Mrs. Ryder. During the course of the trial Mr. Citak also suffered some setbacks in the submission of his proof as a result of the exclusion of evidence of contributions of Mrs. Ryder to her 31 year old daughter executrix. In spite of these developments, Mr. Citak's demand at the close of the evidence was raised from a total of $37,500.00 to $39,000.00 with the proviso that both cases had to be settled.

At all times the carrier offered to settle the claim for injuries and wrongful death of Mr. Ryder for the maximum coverage under its policy, but never made a firm offer of more than $10,000.00 in Mrs. Ryder's case.

The carrier in this case was reinsured for all sums in excess of $20,000.00. Accordingly, when the maximum coverage of $20,000.00 was offered in Mr. Ryder's case, it had no further monetary risk. From that point on it was dealing with the reinsurer's funds. The reinsurer, while kept advised of all negotiations, relied on the carrier to effectuate them.

The carrier evaluates claims of a substantial nature by submitting the facts to a Board of Review consisting of five of its claims men including its Vice President in charge of claims, its Claims Manager, Assistant Claims Manager, and a Home Office Attorney. In reaching an evaluation the Board of Review considers the facts developed on the investigation as to liability and damages, and each member of the Board of Review places his valuation on the claims. As a result of a Board of Review conducted prior to

the conference before Judge Jasen, the cases here were jointly evaluated at between $22,500.00 and $35,000.00. This evaluation by the Board of Review resulted in the $25,000.00 total offer made at the conference before Judge Jasen. As indicated, this was subsequently raised to a total of $30,000.00 during and after the presentation of the evidence.

During all of the negotiations after Mr. Ryder's death the parties were in accord that damages for Mrs. Ryder's wrongful death, at least insofar as her husband was concerned, would be measured by the seventeen month period during which he survived his wife. (Under ordinary circumstances, the jury would have been permitted to consider their respective life expectancies, she being 55 years old at the time of her death and he being a year younger.) The parties being unable to dispose of the cases by settlement, the cases were submitted to the jury which found a verdict of $38,280.00 in favor of Mrs. Ryder's estate and $79,468.00 in favor of Joseph Ryder, Jr.'s estate.

Justice King granted motions to set aside the verdicts in both estates unless Mr. Citak stipulated to reduce the verdict in the case of Mrs. Ryder to $17,000.00 plus $1,313.30 of funeral expenses, a total of $18,313.30, and the verdicts in favor of Joseph Ryder's estate to $48,951.71. The executrix consented to the reduction of each verdict.

Almost the sole factual issue on the trial relates to a conversation between Mr. Wagner, the attorney for the defendant Bates in the negligence cases in Supreme Court, and Mr. Citak. Mr. Citak testified that in a conversation with Mr. Wagner, Wagner told him that the carrier would pay no more than $10,000.00 in settlement of the wife's claim; that Wagner had so advised the insured with the suggestion that if the insured were willing to contribute to meet the claimant's demands he could do so; and that

the insured rejected the proposal. This conversation allegedly took place just prior to the final conference in Justice King's chambers at which the insured was present with the attorneys for the parties. No mention was made of these facts nor was an effort made to confirm the facts from the insured during the conference. Mr. Wagner testified categorically that he had not made the statement attributed to him. He also denied that he had ever asked Mr. Bates if he were willing to contribute the $9,000.00 difference between the demand and offer. Having heard the testimony I believe that Mr. Citak misunderstood or misrecollected the conversation which concededly took place immediately prior to the conference in the judge's chambers. Plaintiff's counsel, as well as the court, finds it hard to believe that Mr. Wagner, an experienced defense lawyer, would seek a $9,000.00 contribution from Bates.[2]

The court finds it unnecessary to consider the carrier's contention that, since Mr. Bates made no payment on the excess judgment, he was not injured by its entry.

To receive a recovery here (excluding the question of damages) the plaintiff must establish that the carrier's refusal to settle within the policy limits resulted from carrier's bad faith. The insured recognizes this as the touch-stone of liability and in his complaint specifically alleges the defendant's bad faith refusal.

The statement of the rule is simple: a carrier is not liable in damages for failure to settle within policy limits unless it acted in bad faith. The difficulty arises in determining the elements that should be considered on this issue.

There is no question and the parties are in accord that the law of New York governs in this case. The New York cases on the subject are completely cited and thoroughly analyzed in three cases

2. "Although it is hard to believe that any competent defense lawyer would do such a thing, yet Wagner's denial from the stand lacked the ring of indignation, one would normally expect to hear." Brief for Plaintiff, p. 8.

in this circuit.[3] It is not necessary that that be done again. The principles enunciated in Harris, Brown, and Brochstein, while not in complete harmony, are adequate as a guide in determining the rights of the insured and the rights, duties, and liabilities of the carrier in this case.

It has been concluded that New York is "unyielding in declining to recognize any duty to settle, or to see 'bad faith' in refusals to settle, or other acts, that, circumstantially, suggest that the insurer pursued its own interest and left the insured to take care of his own exposure to uninsured liability."[4] It has also been anticipated that the New York courts, "in implementing the good-faith settlement standard, would conclude that the interests of the assured must be given at least equal consideration in evaluating the propriety of a settlement."[5]

It is not necessary to choose between these standards. The application of either conflicting standard would result in a judgment in favor of the carrier. Applying the first standard would justify granting the carrier's motion for a dismissal at the close of the plaintiff's case. Under the broader standard, the factual issues require consideration.

In Brown, the Court of Appeals, in reversing a dismissal of the plaintiff's complaint at the end of all of the evidence and remanding the case for submission to a jury on the factual issues, pointed out the factors to be considered on the question of bad faith. One factor is the likelihood, because of the nature of the injuries and the facts on liability, that a verdict would be returned which would be far in excess of the policy limits, coupled with the carrier's refusal to accede to a settlement demand within the policy limits.

Insofar as the claim arising out of the injuries and subsequent death of Mr.

Ryder is concerned, there is no question that the likelihood of a verdict in excess of the policy limits was so great that a refusal to settle for or within the policy limits on his claim alone would be sufficient evidence of bad faith on the part of the carrier. However, the carrier at all times evidenced a willingness to pay the maximum amount of its potential liability under the policy in connection with that claim.

Consequently, any claim of bad faith would need to find support in a refusal, in the companion claim alleging conscious pain and suffering and wrongful death, to meet Mr. Citak's "rock-bottom" demand of $17,500.00 or maximum demand of $19,000.00 made between the close of the proof and the submission to the jury.

If the strong likelihood of an excess verdict, present in Mr. Ryder's case, also existed with reference to the wrongful death claim of Mrs. Ryder's estate, the carrier's refusal would be considered as arbitrary and evidence of bad faith.

However, the carrier's judgment that such was not the case was supported in the final analysis not only by Justice King's reduction of the verdict for wrongful death to $17,000.00 plus the $1,313.30 funeral expenses, but also by the executrix's stipulation to accept the reduced amount, in lieu of what would appear to be a relatively simple retrial or appeal.

Additional factors to be considered under Brown include "failure properly to investigate the circumstances of the accident so as to ascertain the evidence against the assured, attempts by the company to induce the assured to contribute to a settlement within the policy limits, failure of the insurer to inform the assured of a compromise offer, and a considerably greater burden of the financial risk involved in litigation falling

3. Harris v. Standard Accident and Insurance Co., 191 F.Supp. 538 (S.D.N.Y.), rev'd, 297 F.2d 627 (2d Cir. 1961), cert. denied, 369 U.S. 843, 82 S.Ct. 875, 7 L. Ed.2d 847 (1962); Brown v. United States Fidelity and Guaranty Co., 314 F.

2d 675 (2d Cir. 1963); Brochstein v. Nationwide Mutual Insurance Co., 266 F. Supp. 223 (E.D.N.Y.1967).

4. 266 F.Supp. at 225.

5. 314 F.2d at 678.

upon the assured than upon the company."[6]

The evidence before the court indicates a proper investigation concerning the accident. The investigation was sufficiently thorough to indicate that a presentation of the facts surrounding the accident itself would be likely to militate against the insured and enhance a plaintiff's verdict. Accordingly, carrier admitted liability in a tactical maneuver to minimize the verdicts.

There were no "attempts by the company to induce the assured to contribute to a settlement within the policy limits."

The assured was kept informed as to the material developments in the case to the unusual extent of having him participate in the final conference in the court's chambers in which the offers and demands were reviewed and the potential personal liability of the assured was disclosed. If the insured was misled in any way in that conference it would have resulted from the statement of counsel for the plaintiffs;[7] in fact, however, any misunderstanding is unlikely in view of the court's clear statement.

■ There is no question that the refusal to meet Mr. Citak's demands resulted in exposing the insured to substantial personal liability by reason of an excess judgment in the Joseph Ryder case. Recognizing this and apparently trying to avoid such exposure, the carrier offered policy limits in settlement of that claim. Even though the carrier's liability would result not because of a failure to offer a sufficient amount in settlement of Mrs. Ryder's claim but because of a bad faith refusal to meet Mr. Citak's demand within the policy limits, the carrier coupled the Joseph Ryder

offer with what cannot be considered as an unreasonable compromise in the Sadie Ryder claim. At various times throughout the settlement negotiations the demand would have required that the carrier pay either $17,500.00 or $19,000.00 in settlement of Mrs. Ryder's claim, in spite of its evaluation of the settlement value of the case at $10,000.00, or at most $15,000.00, the amount of its reserve. While the demand of the plaintiff in the Sadie Ryder case varied little from the ultimate liability determined and acceptable to the plaintiff, good faith does not require that the defendant abandon its own judgment honestly formed as to the value of the case and contribute additional thousands of dollars in order that the insured be not exposed to an excess verdict in the companion case. It is difficult for the most experienced judge or lawyer to predict with greater accuracy the dollar amount of a jury verdict; good faith does not require the powers of an omniscient seer.

In fact, neither the plaintiff nor the carrier were too far off in the ultimate result in the Sadie Ryder claim. Policy coverage was adequate to protect the assured.

■ In summary, after a consideration of all of the circumstances disclosed on the trial, I find that the assured failed to establish that the carrier's refusal to meet Mr. Citak's demand of a "package settlement" resulted from bad faith on the part of the carrier. I find that the carrier's conduct of the negotiations and trial of the claims was marked by good faith.

CONCLUSIONS OF LAW

1—The court has jurisdiction of the subject matter and parties to the suit.

---

6. Id. 314 F.2d at 679.

7. Mr. Citak: You're fully aware, sir, of the fact that if there is a Jury Verdict in the case of Sadie Ryder over and above $20,000.00, that it is your personal responsibility?
 The Defendant: Yes.
 Mr. Citak: Fine.
 Record of proceedings before Hon. Gilbert H. King, Justice of the Supreme

Court, on Monday, October 19, 1964, p. 7.
 If the claim in this action is limited to an excess verdict in the case involving Sadie Ryder, Bates would have no personal responsibility and would have sustained no damage; the judgment in her case was within policy limits.

2—The plaintiff has failed to establish any right to relief.

3—The defendant is entitled to judgment in its favor dismissing the claim of the plaintiff herein.

4—Judgment should be entered accordingly.

So ordered.