Nathan **BROCKSTEIN** and Manuel Brockstein, doing business as Church Avenue Poultry, Plaintiffs-Appellants,

v.

**NATIONWIDE MUTUAL INSURANCE COMPANY**, Defendant-Appellee.

**No. 131, Docket 31393.**

United States Court of Appeals
Second Circuit.

Argued Sept. 8, 1969.

Decided Oct. 20, 1969.

Jacob W. Friedman, New York City (Sheldon & Tarnoff, on the brief), for plaintiffs-appellants.

Charles G. Pillon, New York City (Whalen, O'Neill & Pillon, New York City, on the brief), for defendant-appellee.

Before LUMBARD, Chief Judge, SMITH and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

The sense of repose afforded by the knowledge that one is insured is sometimes shattered by the rude news that a policy does not fully cover a claim. What happens after that is a fertile source of litigation by insured against insurer. This is such a case, in which plaintiffs Nathan and Manuel Brockstein, doing business as Church Avenue Poultry, appeal from a judgment in favor of their insurer, defendant Nationwide Mutual Insurance Company, after a non-jury trial before John F. Dooling, Jr., J., in the United States District Court for the Eastern District of New York. Plaintiffs sued to recover $25,000, the amount they paid in excess of the policy limit to settle a judgment against them in a death action. For reasons given below, we remand the case to the district court.

## I.

The action arises out of an accident that occurred in March 1960, when Irving Bloom, an employee driving a truck owned by plaintiffs, fatally injured John F. Kiely in backing up. At that time, plaintiffs were insured by defendant Nationwide against liability for personal injuries or death resulting from use of the truck by plaintiffs or their employees. Maximum coverage for any one person was $50,000. According to the findings of the court below, Mr. Kiely died in the hospital eight days after the accident. Kiely was then 59, had an indicated life

expectancy of 16.4 years, and was earning $7,000 per year. Shortly thereafter, the decedent's administratrix sued the Brocksteins and Bloom. The complaint had two causes of action: one, based on wrongful death, sought damages of $50,000 for the widow; the other, based on the deceased's pain and suffering, claimed $500,000.[1] Counsel for the administratrix was Harry H. Lipsig, an experienced and well-known trial lawyer. Settlement attempts, of which more later, were abortive; the case was tried in January 1963. The jury returned a verdict of $65,000 on the wrongful death claim and $30,000 on the pain and suffering action. Judgment, as finally entered, was for $106,413.33. This liability was discharged by payment to the administratrix of $83,847.81, of which defendant Nationwide paid $58,847.81 ($50,000 plus interest and costs) and the Brocksteins paid $25,000. Thereafter, in the action now before us, the Brocksteins sued Nationwide for the $25,000.

The theory of plaintiffs' action is that under New York law, which concededly governs, Nationwide did not properly represent their interest in its efforts to settle the case. The insurance policy provided that with respect to the relevant coverage, the insurer shall:

> defend any suit against the Insured alleging such injury * * * and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the Company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient.

While this broad statement appears to give the insurer unlimited settlement discretion, such is not the case—and for good reason. The policy confers upon the insurer the exclusive right to decide whether to settle or defend, but that decision may affect not only its own interest but also that of the insured. Since the insurer has that exclusive right, it must take responsibility for its exercise. While the insurer has an interest in paying out as little as possible on claims covered by its policies, the insured has an interest in not being exposed to a judgment beyond the policy limit. When these two interests conflict, the company has the unenviable duty of dealing fairly with them both. See Harris v. Standard Accident & Insurance Co., 191 F.Supp. 538, 540 (S.D.N.Y.), rev'd on other grounds, 297 F.2d 627 (2d Cir. 1961), cert. denied, 369 U.S. 843, 82 S.Ct. 875, 7 L.Ed.2d 847 (1962). Therefore, the insurer's power not to settle is actually more limited than the language of the policy indicates.

We have recently reviewed the applicable cases dealing with the insurer's obligation in settlement situations. In Brown v. United States Fidelity & Guaranty Co., 314 F.2d 675 (2d Cir. 1963), we concluded that a New York court would require at the very least that the insurer's decision whether to defend or settle must be made in good faith and that "in evaluating the propriety of a settlement" when the interest of the company and the insured may differ, the interest of the latter "must be given at least equal consideration." We there stated, 314 F.2d at 678, that the rule may be phrased as follows:

> "With respect to the decision whether to settle or try the case, the insurance company must in good faith view the situation as it would if there were no policy limit applicable to the claim." [Keeton, Liability Insurance and Responsibility for Settlement, 67 Harv.L. Rev. 1136, 1148 (1954)] "[T]he fairest method of balancing the interests is for the insurer to treat the claim as if it were alone liable for the entire amount." Bell v. Commercial Ins. Co., 280 F.2d 514, 515 (3d Cir. 1960).

Moreover, we quoted, 314 F.2d at 679, from the district court opinion in *Harris, supra,* to emphasize that an insurer's bad faith

> is most readily inferable when the severity of the plaintiff's injuries is such that any verdict against the insured

---

1. The complaint was amended to reverse these figures after the verdict came in.

is likely to be greatly in excess of the policy limits, and further when the facts in the case indicate that a defendant's verdict on the issue of liability is doubtful.

New York law was again assessed in *Young v. American Casualty Co.*, 416 F.2d 906 (2d Cir. 1969), which was issued after Judge Dooling's decision in this case. Chief Judge Lumbard stated there for this court at 910:

> Where, because of the likelihood that an excess verdict will be returned, the greater financial risk of the litigation rests on the insured, a finding of bad faith on the part of the insurer may be based on such factors as these:
>
> (1) The failure of the insurer to investigate properly the circumstances of the accident.
>
> (2) The refusal of the insurer to accept a settlement within the limits of the policy.
>
> (3) The failure of the insurer to inform the insured of a compromise offer.
>
> (4) The failure of the insurer to attempt to induce contribution by the insured. [Footnote omitted.]

With this brief summary of our recent decisions construing New York law,[2] we turn to the facts of the case before us.

## II.

■ Plaintiffs claim that the failure of Nationwide to settle the *Kiely* action against the Brocksteins for less than the policy limit of $50,000, coupled with Nationwide's other actions and inaction, conclusively show its bad faith. That the *Kiely* action could have been—and almost was—settled for less than $50,000 is clear. Judge Dooling found that the early demand in the case by Kiely's lawyer, Lipsig, was for $100,000, but that well before trial, Lipsig told O'Neill, one of the insurer's lawyers, that if the policy limit was $50,000, Lipsig would recommend settlement for $45,000, that this offer was repeated by Lipsig at a later pre-trial conference and at trial, and finally, that during the trial the presiding judge told O'Neill that the case could be settled for $40,000. Meanwhile, the insurer's evaluation of the case for settlement purposes was not too far off from Lipsig's. When the driver of the truck, Bloom, was deposed in July 1961, plaintiff Manuel Brockstein was told by the insurer's lawyer that he thought the case would be settled out of court for about $35,000. In May 1962, the insurer's Regional Manager, after a full conference with claims personnel, fixed a settlement authorization for the case of $35,000, which apparently was never changed. However, its lawyers were only given "authority" at that time to go to $25,000. Five months later, this authority was increased to $32,500. Nevertheless, in the byzantine bargaining that so often characterizes these cases, Lipsig was apparently never offered more than $15,000 until the trial, when an offer of $32,500 was made. During trial, the insurer finally authorized its attorney to go to $35,000, and this offer was made. Whether this was done while Lipsig was still prepared to take $40,000 is not clear;[3] what is clear is that the parties were at one time during the trial apart by $7,500 at most—and possibly by only $5,000. The jury returned a verdict of $95,000.

Turning to factors emphasized in *Harris* and *Brown*, the parties disagree as to what was a reasonable prediction of the verdict in the *Kiely* action. Kiely was earning $7,000 a year and had a life expectancy of over 16 years when he was killed, had been steadily employed for 30 years before and had no history of prior

2. We note that both Brown v. United States Fidelity & Guar. Co. and Harris v. Standard Acc. & Ins. Co. were cited with approval in Cappano v. Phoenix Assurance Co., 28 A.D.2d 639, 280 N.Y.S. 2d 695 (4th Dep't 1967).

3. Judge Dooling found that after Lipsig rested his case in the *Kiely* action, he raised his figure to $50,000.

illnesses. While his widow would not be automatically entitled to an award of Kiely's entire expected salary, nevertheless a verdict in excess of $50,000 on these items alone was readily predictable.[4] When to this is added a sum for Kiely's pain and suffering for the eight days he lingered, while conscious, in the hospital, it was obvious—in the words of *Harris* and *Brown*—that a verdict "greatly in excess of the policy limits" was "likely," if liability is assumed. As to that, the insurer was inexplicably optimistic about the possibility of a defendant's verdict in a case where Bloom, the driver of the truck, had no visibility "in the center rear," as Judge Dooling found, and injured Kiely while backing up. It is true that Bloom stated at his deposition that he had sounded his horn, but he apparently had never said this before, either to police officers who investigated the accident or at a Motor Vehicle Bureau hearing. All in all, it is clear, in the language of *Harris* and *Brown*, that "a defendant's verdict on the issue of liability" was "doubtful," at the very least.

Accordingly, allowing the case to continue made it highly probable that the Brocksteins would be subjected to personal liability. Their personal exposure was high; it turned out to be $45,000. The additional risk to the insurer was far less; $10,000 at most, assuming that

Lipsig would accept $40,000 in settlement. Moreover, that disposition could have been achieved by an additional offer of $5,000 to $7,500. While all of this under the cases already referred to could be evidence of bad faith, it was certainly not conclusive. Were the inquiry to stop there, we would not be inclined to disturb Judge Dooling's conclusion that Nationwide did not breach its obligations to plaintiffs, even though the judge may have been unduly restrictive in assessing the inferences open to him under New York law.[5] However, the troubling aspect of the case is what transpired between the insurer and its insured, to which we now turn.

In his opinion, 266 F.Supp. at 224, Judge Dooling concluded that at the crucial stage of settlement

> plaintiffs, early notified that the case involved a claim in excess of coverage, and advised during trial of the stages of negotiation and that an adverse verdict was possible and could go into excess, took no action, tacitly looking to defendant to handle the matter. The defendant insurer elected to go to verdict, and the result was disastrous.

The judge also made separate findings that the Brocksteins neither were asked to contribute nor volunteered to do so, and that they were neither given advice on how to proceed nor asked for it.[6] It

---

4. Nationwide argues that the expected verdict would be diminished by reducing to present value the widow's expectancy from Kiely's future earnings. On the record before us, we cannot tell whether such a charge was given in the *Kiely* action or even requested. As to the uncertain practice in New York on such a request, see Committee on Pattern Jury Instructions, New York Pattern Jury Instructions—Civil § 2.320, Comment pp. 516–518 (1965).

5. The judge characterized New York law as
> unyielding in declining to recognize any duty to settle, or to see "bad faith" in refusals to settle, or other acts, that, circumstantially, suggest that the insurer pursued its own interest and left the insured to take care of his own exposure to uninsured liability.

266 F.Supp. at 225. That this appears to be in conflict with this court's statement in *Brown*, 314 F.2d at 678, was recognized by District Judge Port in Bates v. Merchants Mutual Ins. Co., 277 F.Supp. 308, 312 (N.D.N.Y.1967), aff'd per curiam, 392 F.2d 591 (2d Cir. 1968).

6. The only written advice given was a letter from Nationwide to the Brocksteins in January 1962—after the key depositions in the case had been taken—which stated:
> As you know the accident involving John F. Kiely who was killed in an accident on March 7, 1960 has commenced an action against the company and against Irving Bloom. This matter has been in suit for some time and as you may remember is being handled for you and for Nationwide by James T. Whalen's office. We know you have

is not clear from the findings whether the Brocksteins were kept adequately informed of the course of settlement negotiations, of the realistic chances of an adverse verdict above the policy limits, and of how high such a verdict might be. In particular, it is not clear whether the Brocksteins were ever told that $40,000 would settle the case, and that the insurance company was not willing to go beyond $35,000. The failure to keep the Brocksteins informed in this matter could itself contribute to an inference of bad faith under the authorities discussed above. Moreover, even if it is found that the Brocksteins were kept fully and precisely advised, they were never told— either when Nationwide cursorily informed them that they had a right to have their own separate counsel participate [7] or when the settlement negotiations were at their peak—that they could contribute to a settlement.

■ The insurer argues that it is "ridiculous" [8] to assume that the Brocksteins were so willing, but we do not agree. Perhaps they would not have advanced one cent, but we simply do not know what plaintiffs would have done if the subject of contribution had been discussed with them at the crucial time with explicit advice as to the possible alternative courses open and the additional amount required to settle. At the very least, we think that the trial judge should make a finding on the issue. For the crux of the matter is this: At the time when the parties were so close, the Brocksteins needed what then District Judge Kaufman in *Harris, supra,* 191 F.Supp. at 543, n. 10, called the "judgment * * * of an informed expert," since they could "hardly be expected to make an objective appraisal of the facts and relevant law in their own case." This need is pointed up by Nationwide's reliance in this court on testimony of Nathan Brockstein that he did not think that Bloom was responsible for the accident and that he would not be willing to pay money for something he was not responsible for. Such a decision by an insured cries out for the "judgment of an informed expert"—for precise information and an informed reasonable prediction rather than cursory information. In assessing Nationwide's liability here, great significance would attach to a finding whether the Brocksteins would have made a contribution to the settlement had they been *properly* apprised of the possibilities of the risk they ran. We note that under *Young, supra* at 416 F.2d at 911, the burden is on Nationwide to show that the Brocksteins would not have contributed.

■ We realize that the situation of the insurer at that stage is delicate: If it presses its insured too hard—or even at all—that may be evidence of bad faith,[9] but if it does absolutely nothing,

been giving him every cooperation possible. We wish to call your attention to the fact that you have been sued for an amount in excess of your policy limits. To that extent therefore you have an uninsured interest in this action. If you should desire to retain your own personal attorney at your own expense to protect this uninsured interest please feel free to do so. Understand however that whether or not you should do this rest entirely with you.

If you have any further questions about this matter please do not hesitate to call this office or the offices of Mr. Whalen at any time. Our telephone number here is WHite Plains 8–6500.

The first sentence of the letter was, of course, not only obscure but inaccurate in its reference to an action against the company. As the Brocksteins found out to their ultimate dismay, the action was against them.

7. See note 6 *supra.*

8. Appellee's brief, p. 15.

9. While there do not seem to be any New York cases directly on point, suggestions that the insured contribute to a settlement have been relied on in a number of jurisdictions as one indication of bad faith. See, e. g., American Mut. Liab. Ins. Co. of Boston, Mass. v. Cooper, 61 F.2d 446 (5th Cir. 1932), cert. denied, 289 U.S. 736, 53 S.Ct. 595, 77 L.Ed. 1483 (1933); Brown & McCabe Stevedores, Inc. v. London Guar. & Acc. Co., 232 F. 298 (D.Ore.1915); Keeton, *supra*

that too may count against it.[10] Judge Dooling clearly saw the problem, but apparently concluded that the insurer, to avoid a finding of bad faith, need never engage in conduct in between these two extremes. We do not agree. The judge aptly recognized the need for "a controlled arms-length discussion between the assured and the insurer about their respective interests in the settlement." 266 F.Supp. at 227. We think that this need must be met, a proposition not adequately recognized by the judge.[11] There is nothing per se improper in the bare mention by the insurer that contribution is possible.[12] Any impropriety would seem to arise from *insistence* upon a contribution as the price of settlement, particularly where the amount demanded is relatively high compared with what the insurer is willing to contribute. There is no inconsistency in requiring the insurer to *inform* the insured of his chance to make a contribution in order to settle the case. We hold that bad faith may be evidenced by the failure of the insurer even to mention to the insured his opportunity to make a relatively small contribution to avoid a large exposure. Although we find no New York case directly on point, we believe that this holding is a correct prediction of what the New York courts would decide on the issue.

Accordingly, we remand the case to Judge Dooling to make further findings —on this record if he can or on a reopened record if necessary—as to (1) precisely what the Brocksteins were told or knew regarding the amount needed to settle the *Kiely* action, the amount the insurer was willing to contribute, and what their potential personal liability was, and (2) what they were then willing to contribute themselves.[13] Thereafter, the court should again decide upon the entire record whether Nationwide acted in bad faith under the principles set forth herein. Judgment remanded for further proceedings consistent with this opinion.

at 1149 n. 32; 7A J. Appleman, Insurance Law and Practice § 4711 n. 12 (1962).

10. Indeed, the situation of the insurer's lawyer is even more delicate. See Keeton, *supra* at 1157–1173. Keeton suggests various changes in policy forms to remove potential conflict. Id. at 1183–86.

11. Thus, the judge stated, 266 F.Supp. at 227, that at the critical point the insurer's lawyer

deals with the personal-injury plaintiff not as representing the assured but as representing the insurer to the extent of its interest, and without, apparently a duty even to report the settlement discussion to his nominal client, the assured.

12. Keeton, *supra* at 1149–1150 n. 32.

13. We do not preclude the judge from reopening the record to ascertain other facts, see, e. g., note 4 *supra*.