FRED KNOBLOCH et al., Respondents, *v.* ROYAL GLOBE INSURANCE COMPANY, Appellant.

Second Department, December 9, 1974.

*George S. Pickwick* (*William F. McNulty* and *Anthony J. McNulty* of counsel), for appellant.

*Bernard R. Selkowe* for respondents.

SHAPIRO, J. Plaintiff Rena Knobloch owned an automobile which was covered under a $10,000 to $20,000 policy of liability insurance issued by the defendant, Royal Globe Insurance Company (Royal Globe). On June 2, 1962 her son, Fred Knobloch,

the other plaintiff, was driving the insured automobile when it was involved in a one-car accident in which a passenger, John A. Wickman, was injured. As a result of the accident Wickman sued the Knoblochs and the East Hudson Parkway Authority to recover damages for the injuries sustained by him.[1] He recovered a judgment against the Knoblochs and the Authority for $75,383.50, which on appeal was affirmed by this court (*Wickman* v. *Knobloch*, 34 A D 2d 617). The judgment was satisfied by the Authority and the Knoblochs — each paying one half — with Royal Globe, as the Knoblochs' insurer, paying $10,000 (plus interest and costs) — its policy limit — toward the payment made by their insureds. The Knoblochs, contending that their insurer, defendant Royal Globe, in bad faith failed to settle the claim against them, within their policy limits, when it could have done so, have recovered a judgment for $30,236.50, representing the amount above $10,000 they were compelled to pay (plus additional amounts for interest, the expenses incurred by them on the appeal in the *Wickman* case, and the costs and disbursements in this case). We reverse the Knoblochs' judgment and dismiss their complaint. By reason of that determination we must also reverse an order which had granted a motion by the Knoblochs to add interest to the $30,236.50 recovery, and must dismiss the motion as academic.

### THE QUESTION ON THIS APPEAL.

The major issue raised by this appeal is a novel one — whether a settlement offer of the maximum coverage of the policy made by an insurer a few days before the beginning of the trial, with notice of that offer being given to the insureds at that time, can sustain a finding of lack of good faith in protecting the insureds' interest sufficient to make the insurer liable for the excess which its insureds had to pay under the judgment against them. We answer that question in the negative.

### THE FACTS.

After the accident described hereinabove in the preliminary statement, Royal Globe's representatives were in touch with one Browne, the attorney for Wickman. In 1962 there were two such communications, in one of which Browne was informed of the $10,000 policy coverage. In December, 1962 Royal Globe notified the Knoblochs of their possible personal liability over and above the policy coverage and of their right to have their

---

1. The Authority was sued on the theory that a rough section of the Taconic Parkway where the accident happened contributed to the occurrence.

own attorney co-operate in the defense of the action. On January 7, 1963 Royal Globe arranged with Browne for an examination of the injured claimant by its doctor. On May 19, 1964 Browne offered to settle the case against the Knoblochs for $9,500. He was asked to provide the insurer with data on special damages. On December 15, 1965 Royal Globe's representative, when told by Browne that he wanted all or nearly all of the $10,000 coverage, said he might recommend such an amount but needed an authorization to obtain Wickman's hospital records and proof of his lost earnings and hospital bills. On March 11, 1966 Royal Globe's representative told Browne he had the hospital authorization but not the hospital and medical bills. On September 20, 1966 Browne was told by Royal Globe's representative that it had not yet received some of the bills and earnings data. On February 27, 1967 Browne was informed by Royal Globe that the claim would be taken up by its committee and that he would be given its best figure. On March 10, 1967 Royal Globe offered Browne $6,500. He rejected the offer, reiterating his demand for $9,500. In February, 1968 Browne again spoke to Royal Globe's representative and repeated his willingness to take $9,500. He was given a firm offer of $8,500 and was asked if he would take $9,000. Browne refused, standing on his $9,500 demand. On March 21, 1969, when the case appeared on the day calendar, Royal Globe's trial attorney requested an adjournment because Fred Knobloch was on a business trip outside of the country. An adjournment to April, 1969 was granted. At the time of this adjournment Royal Globe's counsel told Browne that Knobloch had retained private counsel, one Bernard R. Selkowe. On April 3, 1969 Royal Globe's representative offered Browne $9,000. He refused to accept that sum saying, " At this stage of the game I am going to let the case ride." On April 9, 1969, and shortly before the trial was to begin, Royal Globe's trial counsel told Browne that the Royal Globe representative who had been handling the negotiations with him " had foolishly been trying to save some money, a few dollars in this case, and he told * * * [the representative] to throw in the whole policy." He then offered Browne the total policy coverage of $10,000. Browne rejected the offer.

On April 12, 1969, two days before the trial of the Wickman suit commenced, plaintiff Fred Knobloch authorized his attorney, Selkowe, to offer up to $10,000, plus costs, on his behalf as a contribution to a possible settlement of the claim against him and his mother. On April 14, 1969, the first day of the

trial of the Wickman case, Royal Globe's trial counsel again offered the full policy coverage of $10,000 plus costs and Selkowe offered an additional $2,500. This offer was rejected by Browne, who indicated that he wanted $60,000 from both sets of defendants (the Knoblochs and the Authority). The Attorney-General, who was representing the Authority, refused to contribute anything to a possible settlement. Selkowe made no offer to contribute more than $2,500 above Royal Globe's offer of its policy limit of $10,000, even though admittedly he had been authorized by the Knoblochs to go as high as $10,000, if necessary. Selkowe testified that he "indicated" that he would go higher and "called upon the Royal Globe to offer above its ten; and the Royal Globe wouldn't offer a cent above its ten. So, therefore, there was no point in my going above the $2500".[2] The trial then proceeded, resulting in a judgment in favor of Wickman against the Knoblochs and the Authority, as above stated, for $75,383.50.

### THE LAW.

Under present New York case law the obligation of an insurer to its insureds in connection with its determination of whether to settle claims against the insureds for risks covered by the policy, or to defend them if they go to litigation, is solely one of good faith conduct and there is no liability for mere negligence in failing to settle a claim.

In *Auerbach* v. *Maryland Cas. Co.* (236 N. Y. 247) the plaintiffs were the insureds under a $5,000 policy of liability insurance issued by the defendant. While the policy was in force their car was involved in an accident resulting in personal injuries to a married woman named Mrs. O'Neill. Mrs. O'Neill thereafter brought an action against the insureds to recover damages in the sum of $40,000 for her injuries and her husband sought to recover $10,000 for loss of her services. During the pendency of the action, which was defended by the insurer pursuant to the terms of its policy, the insurer had an opportunity to settle the action for $6,500, which it declined to do unless the insureds contributed $3,000 toward the settlement. The case thereafter proceeded to trial and resulted in a verdict of $20,000 in favor of Mrs. O'Neill and $5,000 in favor of her husband.

---

2. It should be noted that Browne, on behalf of Wickman, had indicated his willingness to accept $35,000 to release the Knoblochs and it is therefore quite possible that if the Knoblochs' attorney had offered to put in the $10,000 above Royal Globe's $10,000, as he was authorized to do, the action might have been settled as to the Knoblochs.

Under those facts the Court of Appeals held that the insurer was not in default of any contractual obligation assumed by it to its insured when it refused to contribute more than $3,500 of its policy limit of $5,000 toward the settlement of the O'Neill action, saying (*Auerbach* v. *Maryland Cas. Co., supra*, pp. 252–253):

" There are no allegations in the complaint to the effect that the insurance company was negligent either in investigating the facts connected with the accident, or in the defense of the action, not a suggestion that it was guilty of fraud or misrepresentation in any way. A contract of insurance, like other contracts, is to be construed according to the sense and meaning of the terms which the parties have used; and if such terms are clear and unambiguous, they are to be understood in their plain, ordinary and popular sense. (*Imperial Fire Ins. Co.* v. *Coos County*, 151 U. S. 452; *Drilling* v. *New York Life Ins. Co.*, 234 N. Y. 234.) The terms here used are clear and unambiguous. The intent of the parties, if the language used be given a reasonable construction, cannot be misunderstood. *There is nothing in the policy by which the insurance company obligated itself to settle, if an opportunity presented itself. It was given the option to settle, if it saw fit to do so, or to try the action, as it preferred. It, however, was under no legal obligation, either express or implied to compromise or settle the claims prior to the trial.* The plaintiffs when they accepted the policy, did so with full knowledge of the fact, if an action were brought, that they surrendered to the insurance company absolute, full and complete control of it, including the settlement or trial. (*Rumford Falls Paper Co.* v. *Fidelity & Casualty Co.*, 92 Me. 574; *Schmidt* v. *Travelers Ins. Co.*, 244 Penn. St. 286.) They also knew there was no provision in the policy which obligated the insurance company to pay any amount whatever prior to the rendition of a judgment. The policy was one indemnifying them ' against loss or liability imposed by law.' The loss or liability here provided for contemplated the liquidation of a claim, if one were made, by the rendition of a judgment unless the insurance company saw fit to exercise the option which it had to settle and compromise without a trial.

" It is true the insurance company realized, prior to the trial, that the terms under which a settlement could be had were favorable ones and that the same ought to be accepted. It so advised the plaintiffs in writing. The advice thus given imposed upon it no legal obligation to make the settlement. It knew that its liability was limited to $5,000, and while it offered to pay $3,500

towards a settlement, that did not impose upon it the obligation to pay the full amount of the policy prior to the trial. *The probability that judgments much larger than $6,500 would be recovered was as well known to the plaintiffs as to the insurance company.* Each of the parties had full knowledge of all the facts. It is not suggested that the plaintiffs were misled by reason of the suppression of any of the facts by the insurance company or any fraud practiced upon them by it.

" The case in principle cannot be distinguished from *McAleenan* v. *Massachusetts Bonding & Insurance Co.* (173 App. Div. 100; affd. 219 N. Y. 563); *Levin* v. *New England Casualty Co.* (101 Misc. Rep. 402; affd. 187 App. Div. 935, which, in turn, was affirmed by this court, 233 N. Y. 631).

" *The insurance company, in refusing to settle the actions, did what it had the legal right to do under the terms of the policy* " (emphasis supplied).

If under *Auerbach* the insurance company could not be held liable for the excess recovery even though it realized, " prior to the trial, that the terms under which a settlement could be had were favorable ones and that the same ought to be accepted ", how can the insurer here be cast in liability, when not only did it not refuse to settle for less than its policy limit but in fact offered to pay every penny that it was obligated to under its policy of insurance?

In *Best Bldg. Co.* v. *Employers' Liab. Assur. Corp.* (247 N. Y. 451, 456), the court said:

" Although this court wrote no opinion in the case of *Schencke Piano Company* v. *Philadelphia Casualty Company* (216 N. Y. 662), it apparently decided that there was no liability for negligence in failing to settle a claim under an accident policy. In that case a judgment in the accident case was recovered for $10,143.93. The case could have been settled for $2,500. The company refused to settle because the insured would not pay part of the amount. Thereafter, the insured sued the company for the amount which it was obliged to pay over $5,000, the face of the policy. The complaint alleged negligence in these words: ' That the defendant herein refused and neglected to settle said action, and for its own benefit and against the wishes of the plaintiff herein arbitrarily and unreasonably refused to settle said claim and suit within the policy limit stated in said policy.'

" Our note in the memorandum recital of our decision calls attention to this complaint as alleging negligence and lack of due diligence. As a verdict was directed against the plaintiffs'

contention of negligence, this court must have decided the point."

Judge CRANE, speaking for a unanimous court, also wrote (pp. 455–456) : " We may ask what would constitute negligence in the failure to settle a case, as distinguished from bad faith. Even when there was little likelihood of recovery, many reasonable persons would think it wise to settle rather than to take any chance with a jury. In most of the accident cases, disputed questions of fact arise. Is the insurance company to determine at its peril whether reasonable-minded men would believe the plaintiff's witnesses in preference to its own? Again, even on conceded facts, as frequently happens, a serious question of law arises as to the nature or extent of liability, if any. Is a jury to say that the insurance company was guilty of negligence in choosing to try out such a question in the courts rather than to settle? "

In *Best Bldg.*, as in *Schencke Piano*, relied on by the court in *Best Bldg.*, the insurer had refused to settle with the insured's injured employee for a stated amount. In *Best Bldg.* the amount was $8,500 and the policy provided for a liability of $10,000; the insurer had offered only $6,500, even though the insured had indicated a willingness to contribute $2,000 toward the settlement; the trial resulted in a judgment of $16,000 against the insured, who then sued the insurer for the excess of the judgment over the policy, i.e., $6,000, less the $2,000 the plaintiff alleged it had been willing to contribute; and the complaint charged the insurer with negligence in handling the case and failing to notify the plaintiff of the offers made by both sides. In affirming the action of the trial court which set aside the verdict for the plaintiff and dismissed the complaint, Judge CRANE said, " The contract of the parties must measure the liability in the absence of fraud or bad faith " (p. 455).

The standard laid down in *Best Bldg.* (*supra*), which limits the liability of an insurer to its insured, in handling settlement negotiations and in determining whether to settle or go to trial, to acting in good faith finds support in subsequent decisions on the subject (*Brockstein* v. *Nationwide Mut. Ins. Co.*, 417 F. 2d 703, 706, 708; *Gordon* v. *Nationwide Mut. Ins. Co.*, 30 N Y 2d 427; *Peterson* v. *Allcity Ins. Co.*, 472 F. 2d 71; *Parisi* v. *Maryland Cas. Co.*, 27 N Y 2d 505, affg. 32 A D 2d 1030 [2d Dept. 1969], affg. N. Y. L. J., Nov. 26, 1968, p. 18, col. 7).

Chief Judge LUMBARD in *Young* v. *American Cas. Co. of Reading, Pa.* (416 F. 2d 906), assessing New York law on the question of what constitutes bad faith by an insurer, listed some

of the factors to be considered, as follows (p. 910): "Under New York Law * * * it is well settled that the insurance company is under a duty to negotiate a settlement in good faith and that the interests of the insured must be given ' at least equal consideration in evaluating the propriety of a settlement.' * * * Where, because of the likelihood that an excess verdict will be returned, the greater financial risk of the litigation rests on the insured, a finding of bad faith on the part of the insurer may be based on such factors as these:

(1) The failure of the insurer to investigate properly the circumstances of the accident.

(2) The refusal of the insurer to accept a settlement within the limits of the policy.

(3) The failure of the insurer to inform the insured of a compromise offer.

(4) The failure of the insurer to attempt to induce contribution by the insured."

The last word on the subject, and one which to me seems conclusive on the question here at issue, is the statement of the court in Gordon v. Nationwide Mut. Ins. Co. (30 N Y 2d 427, 439) where Judge BERGAN, speaking for the majority of the court, said: "Where there is a breach of the terms of a contract of insurance, not found to have been made in bad faith, the damage for refusal to settle is limited, both in New York and elsewhere, by the policy coverage or, additionally, to that and the cost of defense where there is also a refusal to defend (Grand Union Co. v. General Acc., Fire & Life Assur. Corp., 279 N. Y. 638; Best Bldg. Co. v. Employers' Liab. Assur. Corp., 247 N. Y. 451; Seward v. State Farm Mut. Auto. Ins. Co., 392 F. 2d 723 [5th Cir.]; Hendry v. Grange Mut. Cas. Co., 372 F. 2d 222 [5th Cir.]; Myers v. Farm Bur. Mut. Ins. Co., 14 Mich. App. 277)."

Applying the foregoing tests to the facts in this case, we find that the plaintiffs make no complaint as to the nature of the insurer's investigation. While Royal Globe did refuse to settle with Wickman for $9,500 for a substantial period of time, the undisputed facts are (1) that a few days prior to the opening of the trial of the personal injury suit it did offer " to throw in the whole policy " and (2) that on the opening day of the trial, in a pretrial conference, it again offered its policy limit of $10,000, plus costs. At that time the plaintiffs' own attorney, then aware of the negotiations and having been empowered by his clients, the plaintiffs here, to offer up to $10,000 as their

contribution to a settlement, actually offered no more than $2,500 and instead, "called upon the Royal Globe to offer above its ten," deciding, when "Royal Globe wouldn't offer a cent above its ten," that there "was no point" in his going above $2,500. Such conduct would appear to raise a serious question as to the plaintiffs' good faith in seeking a settlement that would cut their potential losses. Certainly such conduct by them, when called upon to contribute, after the insurer had offered its full coverage in an effort to obtain a settlement, should, regardless of the other factors in the case, estop them from claiming bad faith on the part of their insurer. What they did was to hazard a trial and verdict rather than offer what they had themselves decided should be their contribution toward a settlement. Their conduct is a clear indication that their considered judgment as to the likelihood of a verdict against them far in excess of the policy limit was not so great as to cause them to offer more than $2,500 above the insurer's coverage. In the face of their own conduct, to permit a recovery here would be allowing them to second-guess the insurer.

Here there is no claim of failure by the insurer to inform their insureds of the demands made by the personal-injury claimant. Clearly the Knoblochs were informed of the possibility of a judgment against them in excess of the policy coverage in December, 1962, which gave them ample time to take any steps they felt necessary to protect themselves. Yet they did not elect to obtain their own lawyer until more than six years had elapsed and then only when the case reached the day calendar.

The record in this case is barren of any evidence of bad faith on the part of the insurer, unless the continued refusal until shortly before the trial to meet the claimant's demand of $9,500 is such evidence. We submit that it is not. Nothing done by the insurer during the prolonged course of the " byzantine bargaining " (*Brockstein* v. *Nationwide Mut. Ins. Co.*, 417 F. 2d 703, 706, *supra*) with respect to a settlement in behalf of the plaintiffs here shows any failure by the insurer to carry out its duty to act in good faith to protect its insureds' interests. It was merely doing what it had a right to do under its contract of insurance. To repeat what Judge BERGAN said in *Gordon* (*supra,* p. 439): " Where there is a breach of the terms of a contract of insurance, not found to have been made in bad faith, the damage for refusal to settle is limited, both in New York and elsewhere, by the policy coverage ". To sustain the plaintiffs' recovery here would be tantamount to laying down a rule

of law that an insurer which had collected a premium based on its maximum liability could bargain with a claimant only at its peril and, if a judgment were rendered in excess of its policy limit, it would then be " stuck " for the difference. To so hold, when the insurer has " thrown in the whole policy " in an effort to obtain a settlement, would be a rewriting of the express and explicit provisions of the policy and would, in pragmatic effect, remove the need for those buying liability insurance to consider how much coverage they should buy to obtain the " sense of repose " which one purchasing a liability policy seeks (*Brockstein* v. *Nationwide Mut. Ins. Co.*, 417 F. 2d 703, 704, *supra*).

My learned brothers, Presiding Justice GULOTTA and Justice HOPKINS, in their respective dissenting opinions indicate their belief that *Auerbach* and *Best Bldg. (supra)* no longer represent the law of this State.[3] However that may be, it certainly would be an unwarranted extension of any New York case to hold that an insurer may be cast in damages where *before* trial it has offered to pay its entire liability under its policy of insurance merely because a jury might decide that it should have made that offer at some *earlier* stage of the litigation.

---

3. See the comprehensive opinion on the relationship between an insured and his insurer in *Rova Farms Resort* v. *Investors Ins. Co. of Amer.* (65 N. J. 474, 500–501 [Aug. 7, 1974]) in which Chief Judge HUGHES, writing for the New Jersey Supreme Court, said: " One day, in an appropriate issue, it may be necessary to separate these conflicting interests. The insured has the right to expect that the amount of protection he has purchased will be offered in compromise where necessary to effect an end to the litigation. On the other hand, the insurer may pursue its own interests and decline to settle a case, for whatever reason (so long as not in bad faith or similarly wrongful). These elements apart, it is contractually free to offer a fraction of its insured's policy limit or nothing at all. However, where the carrier chooses not to offer the limits of coverage, one wonders whether it should not bear the unhappy financial result of that unilateral decision, since it alone profits from the opposite result of the gamble. This resolution would enable the insurer to pursue its own interests in great measure without sacrificing those of its insured so long as it was clear by whom the burden of mistake should be borne. The kind of rule we project, which would settle the nagging conflicts of interest under present law, has already been regarded favorably by some. See *Crisci* v. *Security Ins. Co.*, 66 Cal. 2d 425, 58 Cal. Rptr. 13, 17, 426 P. 2d 173, 177 (1967); *Comment*, 47 Neb. L. Rev. 705 (1968); *Note, An Insrance Company's Duty to Settle*, 41 S. Cal. L. Rev. 120, 138–142 (1968); *Note, Excess Liability: Reconsideration of California's Bad Faith Negligence Rule*, 18 Stam. L. Rev. 475, 482–485 (1966); *Note, Insurer's Refusal to Settle — A Proposal for Imposition of Liability Above Policy Limits*, 60 Yale L. J. 1037, 1041–1042 (1951); *Comment*, 48 Mich. L. Rev. 95, 102 (1949); *Note*, 13 U. Chi. L. Rev. 105, 109 (1945)."

We therefore reverse the judgment, on the law and the facts, and dismiss the complaint,[4] and we reverse the order which granted the motion to add interest, and dismiss the motion, all without costs.

HOPKINS, J. (concurring in part and dissenting in part). I vote to reverse and to grant a new trial.

The defendant requested the following charge:

"The defendant is not responsible in damages for negligence in failing to settle [a] claim within the limits of recovery of judgment for [an] amount over policy limits in absence of fraud or bad faith."

The trial court refused so to charge, and the defendant excepted to the refusal. The request was made in accordance with the law of New York (*Best Bldg. Co. v. Employers' Liab. Assur. Corp.*, 247 N. Y. 451, 455–456). Thus, the refusal to charge was error, and I think, in the context of this case, error which undermined the verdict and requires a new trial. Although the jury was charged that the defendant could be held liable for bad faith in failing to settle the action, the defendant was entitled to a charge that bad faith did not include negligent conduct.

As the proof in the case concerning the defendant's conduct was susceptible of a finding of negligence on the part of the defendant, as distinguished from bad faith, the verdict was left in a posture in which it cannot be said with certainty that it was based on a finding of bad faith alone, or based on findings of negligence and bad faith together, or on a finding of bad faith alone. Hence, the verdict was ambiguous, and a new trial must be had.

I am not in agreement with the majority view that the proof at the trial did not establish prima facie a case against the defendant for its bad faith in failing to settle the suit against the plaintiffs. I agree rather with the opinion of my brother Presiding Justice GULOTTA that the proof established a question of fact for the jury. There is no need to comment at length on the facts which induce my conclusion; the emphasis which is placed on the facts in the majority opinion and in the opinion

4. Cognizant of the fact that insurance companies sometimes refuse to engage in good faith settlement negotiations the Legislature has authorized the imposition of penalties on an insurer who engages in unfair claim settlement practices (Insurance Law, § 40-d, subd. 1, par. d). Thus a penalty may be imposed upon a carrier for "d. not attempting in good faith to effectuate prompt, fair and equitable settlements of claims submitted in which liability has become reasonably clear" (added by L. 1970, ch. 296, § 1, eff. Sept. 1, 1970).

of Presiding Justice Gulotta clearly indicates that reasonable men may differ in their findings, and this in itself is sufficient to demonstrate that a jury question was presented.

The trial court at the new trial, however, should be assisted by a statement of the nature and limits of bad faith for consideration in charging the jury. It is true that the law of New York " is indefinite in many respects " (*Brown* v. *United States Fid. & Guar. Co.*, 314 F. 2d 675, 677; cf. *Young* v. *American Cas. Co. of Reading, Pa.*, 416 F. 2d 906, 910; *Brockstein* v. *Nationwide Mut. Ins. Co.*, 417 F. 2d 703, 705; *Peterson* v. *Allcity Ins. Co.*, 472 F. 2d 71, 76). It is therefore necessary to analyze the relationship which exists between insurer and insured under a policy of insurance.

Insurance policies generally reserve to the insurer both the right to select counsel in the event of an action against the insured within the scope of the policy and the right to settle the action. Within the right to settle must be included a discretion exercisable by the insurer whether an offer to settle by the party suing should be accepted. Obviously, there are two interests which inhere in the policy: (1) the mutual interest of the insurer and insured to defeat the action and (2) the interest of the insurer and insured (which may not be the same under all circumstances) to settle on advantageous terms, when recovery in the action appears probable.

The interests of the insurer and the insured to settle the action are not mutual when recovery may reasonably exceed the policy limits and liability of the insured seems reasonably certain, or at least reasonably debatable. This was the position of the parties in the instant appeal. It is not enough, as my brother Presiding Justice Gulotta ably points out in his dissent, that the insurer on the brink of trial offers to pay the policy limits to the party suing its insured, for by that time the mood to settle may have passed, or facts developed (as in this case) which persuade the suing party that the policy limits are unacceptable. Since the policy limits are static, and recovery beyond the limits probable, the burden of the excess must fall on the insured. The insurer by the terms of its contract has undertaken to defend the insured under all circumstances. The question then is how shall the relative interests of insurer and insured be reconciled?

The earlier New York cases speak in terms of contract and relegate the parties to a strict construction of their rights under the policy (cf. *Auerbach* v. *Maryland Cas. Co.*, 236 N. Y. 247; *Streat Coal Co.* v. *Frankfort Gen. Ins. Co.*, 237 N. Y. 60; *Best*

*Bldg. Co.* v. *Employers' Liab. Assur. Corp.*, 247 N. Y. 451, *supra*). Other jurisdictions have transcended the concept of strict contract law and have fastened a greater responsibility on the insurer toward the insured (see, e.g., *Farmers Ins. Exch.* v. *Henderson*, 82 Ariz. 335; *Crisci* v. *Security Ins. Co. of New Haven, Conn.*, 66 Cal. 2d 425; *Rova Farms Resort* v. *Investors Ins. Co. of Amer.*, 65 N. J. 474; *Cowden* v. *Aetna Cas. & Sur. Co.*, 389 Pa. 459). Instead of a strict contractual duty arising under the policy, the modern view treats the insurer's responsibility as a fiduciary vis-à-vis the insured. Indeed, in *Rova* the New Jersey Supreme Court considered that the insurer had become the agent of the insured in settling the action (*Rova Farms Resort* v. *Investors Ins. Co. of Amer., supra,* p. 474).[1] An agency concept is particularly appropriate, as the insured is bound under the policy not to compromise the action against him; he is thus left to the insurer for the proper representation of his interests.

An agent is, of course, a fiduciary (Restatement, Agency 2d, § 13), subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency (Restatement, Agency 2d, § 387; cf. *Haluka* v. *Baker,* 66 Ohio App. 308, 312). " A fiduciary relationship involves a duty on the part of the fiduciary to act for the benefit of the other party to the relation as to matters within the scope of the relation " (1 Scott, Trusts [3d ed.], § 2.5, p. 39). As part of his fiduciary duty, he may not use confidential information obtained by him through his relationship for his own benefit to the detriment of the other party to the relationship (5 Scott, Trusts, §§ 504, 505). Agency and trust concepts have common elements in that " in both the intermediary is held to a high standard of honesty, must admit no selfish interest, and cannot delegate the performance of discretionary duties " (Bogert, Trusts and Trustees [2d ed.], § 15, p. 70, citing *Bain* v. *Brown,* 56 N. Y. 285; cf. *Tyler* v. *Grange Ins. Assn.,* 3 Wn. App. 167). Where such a fiduciary relationship exists, the agent is required to make full disclosure to the principal and to demonstrate extreme good faith in his dealings with his principal (*Wendt* v. *Fischer,* 243 N. Y. 439; see, generally, Bogert, Trusts and Trustees [2d ed.], § 544).

---

1. In other cases the standard is said to be that of a fiduciary relationship (*Bailey* v. *Prudence Mut. Cas. Co.,* 429 F. 2d 1388; *Tiger Riv. Pine Co.* v. *Maryland Cas. Co.,* 163 S. C. 229, later app. 170 S. C. 286; see, generally, Ann. 40 ALR 2d 181; Ann. 34 ALR 3d 535).

Two features in an automobile insurance policy distinguish the relationship between insurer and insured from the usual agent-principal concept. First, as I have said before, the insurer has its own financial stake under the contract, i.e., the policy limits. This financial interest the insured implicitly recognizes, for it is the protection bargained for. Some of the courts have said, accordingly, that the insurer need not sacrifice its own interest in settling a case, but may place its interest on an equal setting with the interest of the insured (see, e.g., *Cernocky* v. *Indemnity Ins. Co. of North Amer.*, 69 Ill. App. 2d 196; *Western Cas. & Sur. Co.* v. *Fowler*, 390 P. 2d 602 [Wyo.]; *General Acc. Fire & Life Assur. Corp.* v. *Little*, 103 Ariz. 435; *Dumas* v. *Hartford Acc. & Ind. Co.*, 94 N. H. 484; cf. *Cappano* v. *Phoenix Assur. Co. of N. Y.*, 28 A D 2d 639; *Young* v. *American Cas. Co. of Reading, Pa.*, 416 F. 2d 906, *supra*; *Garcia & Diaz* v. *Liberty Mut. Ins. Co.*, 147 N. Y. S. 2d 306). Other courts have said that the insured's interest must be held paramount to the insurer's interest (see, e.g., *Tiger Riv. Pine Co.* v. *Maryland Cas. Co.*, 163 S. C. 229; cf. *Rova Farms Resort* v. *Investors Ins. Co. of Amer.*, 65 N. J. 474, 496, *supra*). It is sometimes said by courts which place the relative interests on a parity in dealing with the insurer's duty to settle that the insurer should consider the matter as if it alone would be liable for the judgment recovered (e.g., *Bowers* v. *Camden Fire Ins. Assn.*, 51 N. J. 62; *Bell* v. *Commercial Ins. Co. of Newark, N. J.*, 280 F. 2d 514; *Cowden* v. *Aetna Cas. & Sur. Co.*, 389 Pa. 459, *supra*). This test of good faith, in my view, is tantamount to saying that the insured's interest must be given priority, for clearly the insurer's interest is limited to the policy amount. Hence, such a test submerges the insurer's interest into the insured's interest and analogizes the insurer's duty to the traditional duty resting on an agent to perform its actions with regard only to the interests of the principal (see, also, Keeton, Liability Insurance and Responsibility for Settlement, 67 Harv. L. Rev. 1136, 1146–1147).

It is true that the traditional duty of an agent does not require that the agent in a relationship where his own interests are independently involved relinquish those interests in favor of the principal (5 Scott, Trusts [3d ed.], § 504, p. 3564). But his interests must be superior in the sense that they arise outside of the relationship (Restatement, Agency 2d, § 418, Comment *b*). Here the interests of the insurer and the insured arose out of the policy, and the conflict is inherent whenever an action against the insured may result in a recovery in excess

of the policy amount. Beyond this consideration, it is also a condition of the relationship that the insured, unlike other principals, has no right to select counsel to represent him in the action, or to direct the course of negotiations to settle the action. Hence, the traditional characteristic of a fiduciary's duty to subordinate his interests for the promotion of his principal's interests should apply to the insurer.

The second feature of an automobile insurance policy strengthens this analysis. New York's public policy demands that an owner of an automobile may not register it for operation within the State unless it is insured. The State Insurance Department is authorized to approve the policy (Vehicle and Traffic Law, § 345, subd. [h]). The standard policy contains the provisions that the insurer shall select counsel for the insured and that the insured may not compromise the action, and these provisions are intended to vest the insurer with complete control over the litigation (14 Couch, Insurance 2d, § 51:125). The policy provisions thus constitute a contract of adhesion, over which the insured has no choice if he desires to operate his automobile in New York (7 Williston, Contracts [3d ed.], § 900, pp. 29–34). Since the insurer has acquired control of the action, it thereby assumes a status of a fiduciary toward the insured, to whom it owes the duty of utmost good faith. The duty of good faith includes recognition of the interest of the insured in case of conflict in the settlement of actions against the insured, and the advancement of the interests of the insured in such a case, even above its own interests. This liberal interpretation of the policy in favor of the insured follows the rule which is usually enforced in contracts of adhesion (see, generally, 4 Williston, Contracts [3d ed.], § 626, pp. 855–857).

In summary, the trial court should charge that the defendant was required to use the utmost good faith in carrying on settlement negotiations of the action against the plaintiff. In determining whether on the circumstances of the case the defendant exercised that good faith, the jury should consider the conduct of the defendant during the negotiations, bearing in mind that the defendant must place the interests of the insured before its own. If, under the facts, the defendant in good faith concluded that a settlement of the action was advantageous to the insured and that recovery in the action might be beyond the policy limits, it was the duty of the defendant to offer the amount of the policy in settlement. Whether under the facts the defendant performed its duty would be a question for the

jury to determine. Good faith in this context means conduct by the insurer in accordance with its honest judgment after consideration of the facts and giving priority to the interests of the insured before its own. In the absence of bad faith, negligence alone on the part of the insurer does not result in liability for failure to settle.[2]

By this rule the interests of the insured are protected and the jury is provided with a standard of conduct which is neither complicated nor difficult of understanding.

GULOTTA, P. J. (dissenting). I dissent and vote to affirm.

The majority takes the position that where an insurance carrier, a few days before trial, "throw[s] in the whole policy" it has fulfilled its contractual obligation to its assured and cannot be held liable for any excess judgment based on bad faith. To concur in that reasoning is to say that by offering its policy limits at the last minute the carrier is granted absolution for all its prior acts, no matter how grievous and even though they may have affected its assured in a detrimentally irreversible manner. I cannot agree.

On June 2, 1962 Fred Knobloch, then a college student 22 years of age, was operating an automobile, owned by his mother, along Taconic State Parkway. He and a passenger, John Wickman, were returning to school. At a point where the roadway was impaired, Knobloch lost control of the car, it left the road and overturned and Wickman was seriously injured. He suffered a compression fracture of the fourth dorsal vertebra, injury to the fifth, sixth and seventh cervical vertebrae and muscle atrophy of the right arm, as well as lacerations of the face resulting in disfiguring scars. His medical bills were about $1,292 and his lost earnings $7,590.

The automobile was insured with Royal Globe Insurance Company, with a liability limit of only $10,000 for one person.

---

2. I am aware that an agent may be liable to the principal to act skillfully in the matters confided to him and that a mistake of judgment, no less, may subject him to liability if he fails to exercise the care which is exacted from an agent under similar conditions in the industry (Restatement, Agency 2d, § 379; cf. *Marchitto* v. *Central R.R. Co. of N. J.*, 9 N. J. 456; *Highway Ins. Underwriters* v. *Lufkin-Beaumont Motor Coaches*, 215 S. W. 2d 904 [Tex.]). Nevertheless, I am impressed with the fact that an insurer should not be held to the standard of due care in managing settlement negotiations, because they are delicate and sometimes intricate maneuvers which may involve more than one defendant (as in this case). Too, in the usual agent-principal relationship, settlement negotiations are the exception, not the usual routine duties, which an agent is called upon to execute.

Settlement negotiations started in 1962 between Wickman's attorney, John Browne, and continued for seven years, until shortly before the trial started on April 14, 1969, but the Knoblochs were not advised of these discussions until just before the trial.

As early as May 19, 1964 Browne offered to accept $9,500 in full settlement of Wickman's claim against the Knoblochs because he had been made aware of the low insurance coverage. Royal Globe rejected the offer, although its own doctor had made a physical examination of Wickman more than one year before and had verified the seriousness of his injuries.[1]

Although by now it was abundantly clear to Royal Globe that the damages far exceeded both the policy limit and Wickman's demand for settlement and that the chances of escaping liability were virtually nil, it continued to stall and procrastinate, making frivolous demands for verification of various items of damage having no real relevance in deciding whether to settle at the very low figure offered.

Finally on March 10, 1967, five years after the accident, Royal Globe made its first offer of settlement — $6,500, which was rejected.

On February 11, 1968 Royal Globe experimentally inquired if Browne would accept $8,500 or $9,000, without actually offering either figure. It was told $9,500 was still open and that was the minimum Browne would accept. On March 21, 1969 the case appeared on the day calendar and Royal Globe's attorney requested an adjournment, explaining that Fred Knobloch was outside the United States on a business trip. Browne testified that this inadvertent allusion and a statement by Royal Globe's counsel that Knobloch had retained private personal counsel indicated to him that "there was a new ballgame" and that "there was more money than $10,000 in this case," so when the insurance company finally offered to pay the $9,500 a few days later (on April 3, 1969) he told its representative that he was now going to "let the case ride".

Sensing now that by revealing its assured to be a business man and no longer a college student and by "foolishly * * * trying to save * * * a few dollars" it might be in trouble with its assured, the company offered the entire $10,000 policy six days later (on April 9, 1969). Browne rejected it

1. It may be noted that at the trial Royal Globe offered no medical witness to rebut Wickman's claimed injuries, thus in effect conceding their seriousness. Additionally, on appeal in the *Wickman* case (*Wickman* v. *Knobloch*, 34 A D 2d 617) Royal Globe did not question the $75,000 awarded in damages by a jury.

and said the case was worth $100,000. The case went to trial on April 14, 1969 and resulted in a jury's verdict for $75,000 against the Knoblochs and the East Hudson Parkway Authority.

As to the Knoblochs' financial status, Browne's assessment of the situation turned out to be correct, since the Knoblochs, mother and son, were persons of financial means who were good for the judgment. They had to pay their pro rata share over the $10,000 insurance coverage — $30,236.

This action sought to recover from Royal Globe that $30,236, plus $25,000 expenses incurred by the plaintiffs in defending against Wickman's action. The jury's verdict herein was for the $30,236 plus $20,000 for the expenses.

The main question we have for decision is what is the measure of the good faith which an insurance company owes its assured in conducting settlement negotiations? There is an ancillary question and that is whether the belated and futile offer of the policy limit after the damage had been done relieved Royal Globe from all liability as a matter of law and insulated it from responsibility for the subsequent damages.

It seems clear to me that the answer to the second question must be in the negative. To be sure, it is a relevant fact for the jury to consider in arriving at a decision on the over-all question of good faith and the jury had this information before it in this case. But there is nothing in logic or precedent which holds that this is a substitute for good faith, i.e., that it precludes recovery even where there has been bad faith.

As Professor Keeton observed in his article entitled "Liability Insurance and Responsibility for Settlement" (67 Harv. L. Rev. 1136, 1148–1149 [1954]): "The company may protect itself against excess liability, where the settlement value of the claim is recognized as being in excess of the policy limits, by making an offer to settle for the maximum sum within the policy limits or by advising the insured of continued willingness to pay such sum *at any time that the claim can be settled for that sum* or for that sum plus whatever the insured is willing to add" (emphasis supplied). The all important point to note here, which takes it out of the rule, is the utter futility of the company's offer at the time it finally made it, for no longer could the case be settled for the policy limit.

It is not seriously disputed that the law implies a requirement of good faith on the part of the company in discharging its obligations to the assured under the insurance contract. The uncertainty centers on how to define good faith by an objective standard.

In this case the trial court charged as follows on this subject: "We do not have any specific definition in our law as to what indicates or evidences bad faith. There is no language in our statutory law that sets forth what the Court can indicate to you to specifically encompass or limit such language of bad faith. It would be for you as a jury panel to determine whether or not the conduct of the parties in this action indicates the presence of bad faith as alleged by the plaintiffs in failing to bring about a settlement within the policy limits and thereby avoid the situation which, in effect, ultimately developed as far as the plaintiffs are concerned, namely, that they were subjected to the judgment in excess of that $10,000 policy and were put to the expenses for which they are now suing in this lawsuit."

At the close of the charge Royal Globe's counsel requested a further legal definition of bad faith. To the Justice's suggestion that he refer the court to a specific authority for the definition he had in mind, he made the extraordinary rejoinder that he was not prepared to say.

Nevertheless the Justice gave the following additional instructions:

"Members of the jury: The Court would further charge you that the defendant insurance company was under an obligation to act in this case as though it were fully liable for whatever judgment might be rendered the plaintiff in this particular lawsuit. In other words, they have to act as though only their own money was on the line here, that they were the only ones at risk of financial loss, and it is that kind of judgment that they must make, an honest judgment as though all the loss were going to come out of their own pocket. This, of course, relates to the obligation of the defendant insurance company with respect to any negotiations that it had before it from the time following the accident.

"The Court further charges you that since the insurance company has power, through the control of settlement, to adversely affect the insured's interests, it must necessarily bear a legal responsibility for the proper exercise of that power. Thus, the law imposes upon the insurer — in this instance, the Royal Globe Insurance Company — the obligation of good faith — basically, the duty to consider, in good faith, the insured's interests as well as its own when making decisions as to settlement."

To the defendant's request that the court charge: "The defendant is not responsible in damages for negligence in failing to settle [a] claim within the limits of recovery of judg-

ment for [an] amount over policy limits in absence of fraud or bad faith," the court refused, saying, "*The Court has, in effect, so charged that the duty and obligation of the plaintiff's here is to establish and prove bad faith*" [emphasis supplied].

In a case where an issue as to negligence has been developed for the jury, I agree that such a request would be appropriate and proper, but in the posture of this case, where there had been no claim of negligent conduct on the part of the defendant, such as failure to properly investigate the case, or try it, or the like, but rather a deliberate decision to ignore the interests of the assured and to consider only its own, the request to charge the effect of negligence was irrelevant and was properly refused.

As to the main issue, the trial court adopted the view of New York law taken by the Federal courts for the Second Circuit in a line of cases including *Young* v. *American Cas. Co. of Reading, Pa.* (416 F. 2d 906); *Peterson* v. *Allcity Ins. Co.* (472 F. 2d 71); *Brockstein* v. *Nationwide Mut. Ins. Co.* (417 F. 2d 703); *Brown* v. *United States Fid. & Guar. Co.* (314 F. 2d 675). The essence of the test of good faith as developed in these cases, particularly *Brown,* is that the insurance company must act as though its own money were at risk for the amount demanded over the policy and that it must consider the assured's interests, as well as its own, in arriving at a decision whether to settle within the policy limits.

The early New York cases seem to have given the insurance company rather a free hand in deciding whether to settle or not (see *Auerbach* v. *Maryland Cas. Co.,* 236 N. Y. 247 [1923]; *Streat Coal Co.* v. *Frankfort Gen. Ins. Co.,* 237 N. Y. 60 [1923]; *Best Bldg. Co.* v. *Employers' Liab. Assur. Corp.,* 247 N. Y. 451 [1928]). Even though the insurance companies were exonerated in all these cases, the last and leading one, *Best Bldg.,* reaffirmed the requirement of good faith and fairness.

In evaluating New York law, Judge KAUFMAN in *Brown* arrived at the conclusion that New York today would apply the standard annunciated by Professor Keeton in Harvard Law Review (vol. 67, pp. 1146–1148). That standard is essentially the one adopted by the Trial Justice in the present case and it is one with which I agree.

A leading case very much in point in a neighboring jurisdiction is *Rova Farms Resort* v. *Investors Ins. Co. of Amer.* (65 N. J. 474), which in many respects is not as strong for the assured as the instant case, although the attitude of the insurance company was on a par with that of the defendant herein.

That case, however, presented a genuine issue of contributory negligence, in that the claimant had dived into murky water without ascertaining that it was only three to four feet deep and had emerged from the accident completely and permanently paralyzed. The company offered $12,500 on a $50,000 policy and never budged from that figure, even after a $225,000 judgment against the assured was on appeal and although warned that on a retrial it might go to $500,000. · The Supreme Court of New Jersey brushed aside the defense that there had never been a formal request by the plaintiff's counsel to settle for the policy limits, stating (p. 485): "We note that substantial evidence before the court revealed a multitude of circumstances which should have impelled Investors to energize a clearly attainable settlement of the McLaughlin claim. Settlement at trial could have been arranged for $75,000, an amount which plaintiffs' attorney was authorized by his clients to accept, as was made known to the McLaughlin trial judge, to Liebowitz, to Roth and, through Liebowitz, to Investors. During those somewhat hectic trial days there were raised many storm signals of potential financial disaster in the face of which Investors maintained a singular imperturbability, never increasing its first-day offer of $12,500."

The court went on to state the rule governing such cases as follows (pp. 492–493): "By virtue of the terms of such a policy, proscribing the insured from settling in his own behalf, the carrier has made itself the agent of the insured in this respect. *Fidelity & Cas. Co.* v. *Robb*, 267 F. 2d 473, 476 (5th Cir. 1959). Thus the relationship of the company to its insured regarding settlement is one of inherent fiduciary obligation. *Bowers, supra; Radio Taxi, supra*, 31 N. J. at 313 (Jacobs, J. dissenting); *Gruenberg* v. *Aetna Ins. Co.*, 9 Cal. 3d 566, 108 Cal. Rptr. 480, 491, 510 P. 2d 1032, 1043 (1973) (Roth, Justice pro. tem. dissenting). When an opportunity for settlement approximates the limit of coverage, it may be tempting for the insurance company to gamble on the outcome of a trial, its exposure not being considerably affected by a verdict in excess of coverage. *See Kaudern, supra*, 277 F. Supp. at 88; cf. *Dumas* v. *State Farm Mut. Auto Ins. Co.*, 111 N. H. 43, 274 A. 2d 781, 784 (1971). Recognizing that such temptations on the part of the carrier are directly in conflict with the interest of the insured in settling within the limits of coverage and thereby avoiding the prospect of excess judgment, this Court declared that where, as in the present case, any adverse verdict at trial is likely to exceed the policy limit, the boundaries of good faith become more com-

pressed in favor of the insured, *and the carrier can justly serve its interests and those of its insured only by treating the claim as if it alone might be liable for any verdict which may be recovered. Bowers, supra; Board of Education, supra* " (emphasis supplied).

*Rova* does not, and I do not, subscribe to the proposition that to require the insurance company to treat with a settlement offer as though the company had unlimited exposure is to compel the company to disregard its own interests and to give the insured complete consideration, to the exclusion of itself. Actually it is a generally accepted rubric that sensible people usually act in good faith where their own interests are at stake, so it is a valid conclusion that they may be in bad faith when they fail to act the same way when someone else's interests are substituted for their own.

This does not mean that a company must always settle a case when it can do so. Many insurance companies with large policy limits often go to trial on the issue of liability where it is fairly arguable whether they will be successful. They do not do so however on a forlorn hope that some miracle will exculpate their assured and thus themselves where all the facts indicate the opposite and they have high exposure. Therefore, when they do so in a case of limited liability, it becomes fairly obvious that they are consulting nobody's interests but their own and that amounts to bad faith, or at least a jury could so find, as it has done in this case.

We must keep in mind that in a negligence suit the assured is not in a position to exercise effective control over the lawsuit or to further his own interests by independent action, even when those interests appear in serious jeopardy. Control of the litigation, even though the assured has private counsel, remains in the hands of the carrier. An assured's private attorney is an inadequate answer to a conflict of interests, since his counsel cannot compel a settlement or take an active part in the trial.

Not to be overlooked as a motivation for Royal Globe's refusal to settle on the very favorable basis offered is the fact that the use for seven years of the money which would have gone into settlement had an intrinsic value all its own, irrespective of whether the defendant entertained any genuine belief that it should refuse to settle because it might win the case. Needless to say, any such motivation would fail to qualify as a good faith reason for exposing the assured to a full recovery for the serious injuries which the defendant knew to exist.

Given what had transpired in this case, it seems fairly obvious that by the time the plaintiffs' private attorney, Selkowe, entered the case, settlement negotiations had deteriorated to a point where the chances of reviving the favorable settlement offer, or anything approximating it, had vanished irretrievably. Thus, there was indeed no point in adding to the proposed contribution by the plaintiffs in the face of the new demand and the defendant's refusal to consider paying any additional sum.

However, be that as it may, we must keep in mind that we are not resolving an issue of Selkowe's bad faith in this lawsuit, assuming there was any, and frankly I do not believe there was. But even if we assume there was, Royal Globe was found to have acted in bad faith (by the jury) not for anything Selkowe did or failed to do, but for what it did and failed to do, and at no time was the jury instructed to hold it responsible for anything else.

I would therefore affirm the judgment.

Christ and Munder, JJ., concur with Shapiro, J.; Gulotta, P. J., dissents in opinion; Hopkins, J., dissents in part and concurs in part in opinion.

Judgment of the Supreme Court, Queens County, entered March 13, 1974, and order of the same court dated March 11, 1974, reversed, on the law and the facts, without costs; and complaint dismissed and plaintiffs' motion to add interest to a portion of the jury award dismissed.